ANDERSON *v.* CHANDLER.

4-8956

223 S. W. 2d 983

Opinion delivered November 7, 1949.

*E. K. Edwards,* for appellant.

*Wendell O. Epperson* and *F. B. Clement,* for appellee.

GRIFFIN SMITH, Chief Justice. Kirk Anderson, John Frachiseur, and Harmon Chandler orally agreed that as

partners they would buy and sell live stock and other personal property as Dierks Stock Commission Company. Unexplained losses occurred during the operational period beginning April 13, 1946, and ending with dissolution of the partnership February 10, 1947. Anderson and Frachiseur, contending that Chandler was active manager in charge of receipts and disbursement, sought an accounting, their position being that irrespective of any evidence showing that a shortage $1,756.49 came about through Chandler's affirmative act of misappropriation, he should be required to repay to each of his former partners a third of the loss because financial management had been entrusted to him.

With the exception of minor adjustments not material to this opinion,[1] of which Chandler does not complain, the Court found that G. G. Hoiston, who was joined with Chandler as a defendant, was liable for $1,137.24 because as bookkeeper he had not satisfactorily explained the shortage; that Anderson and Frachiseur should each receive $568.62 of the principal judgment, that costs should be paid from a balance of $583.15 on deposit in the Bank of Dierks, and that the remainder of the deposit should be divided equally between Anderson, Frachiseur, and Chandler. Hoiston has not appealed.

In arriving at net earnings and sums unaccounted for, the Chancellor relied largely upon an audit made by John Moore, who was employed by Anderson and Frachiseur. The contention of these two, who are the only appellants, is that because Chandler lived closer to Dierks than either of them, it was mutually agreeable that he supervise partnership activities, hence, after the first of June, 1946, financial matters were left entirely with Chandler.

During the first operational period, ending with May, Frachiseur's daughter, Helen, acted as bookkeeper. The records she maintained are not criticized. When she left the first of June, Hoiston was employed. He is

---

[1] An item of $37.20 representing purchase price of a cow, and a cash withdrawal of $3.92, were charged to Chandler in the decree that directed him to pay Anderson and Frachiseur $13.70 each.

Chandler's uncle. Appellants insist they were not consulted when Hoiston was engaged. They also testified that in treating Chandler as treasurer they acted in response to oral arrangements. Since Hoiston is insolvent and the amount awarded cannot be collected from him, they urge that it was error not to hold Chandler liable when it was shown that other members of the association did not handle the money, and were not expected to do so.

Plans of the partners contemplated sales at auction or otherwise, to be held principally at Dierks each Saturday. Farmers having stock or other personal property placed it with the Commission Company, and a percentage charge would be made for the services rendered. After a few weeks this was reduced from four to three percent.

The largest losses sustained by the sales company occurred when Chandler, on advice of one or both of the appellants, signed checks in blank and turned them over to George Meadows and John Garvin upon their agreements to buy for resale at the Dierks auction. They appear to have bought extensively and to have sold, but not through the commission company. When the checking privilege was withdrawn Meadows had not accounted for $776.56, and Garvin owed $2,056.30, a thousand dollars of which was paid later. Anderson, on cross-examination, was asked if it were his practice to permit men like Garvin and Meadows to take the company's checks and buy cattle for resale, and replied, "Yes, on commission." Frachiseur admitted that he "recommended" Meadows to his associates.[2]

Although Hoiston testified that certain transactions consummated by Frachiseur or Anderson were presumptively profitable and that proceeds were not brought to him, the Chancellor was warranted in finding Hoiston's liability to be $1,137.24. But there was no testimony that Chandler received any of the shortage. When sales were made on Saturdays, Hoiston listed the checks and money,

[2] The obligations of Meadows and Garvin were not an issue in the trial, but transactions with them were testified to for the purpose of showing the activities of appellants.

handed them to Chandler, and Chandler usually took them to the bank on Monday. The cashier testified it was Chandler's invariable custom to present the list when a deposit was made, the only variations being in matters of addition, exchange charges, etc. Notes covering overdrafts were made by Chandler when necessary.

Moore, the auditor, testified that the books were of no aid in determining how the shortage occurred. A question asked of him was, "Suppose a [book entry] shows that a mule sold for more than it actually brought: you would not know about that, would you?" There was a negative answer. Neither would the books reflect a loss the company might sustain through sale of live stock.

On cross-examination Frachiseur admitted that on at least one occasion he and Chandler bought 26 head of cattle through the commission. The transaction showed a substantial profit. When asked if the two kept the money this witness replied, "Yes, sir, [but] we shouldn't have done it. We got several 'bawlings-out' from Kirk." Frachiseur was asked if he knew of a single instance in which Chandler had failed to procure a duplicate deposit slip for money or checks given him by Hoiston, and replied that he did not. He did not, during the partnership period, check to find out how the finances were being handled. Because of other business, he "left that to [Chandler] and Hoiston—they were handling the money."

From the weight of evidence the Chancellor could have found that the employment of Hoiston was acceptable to appellants. For a long period of time they knew what his duties were. There was no testimony from which it could be adjudged that Chandler's information was such that in not proceeding more expeditiously to check against Hoiston an obligation to appellants was violated to such an extent that personal liability should attach. If in giving employment to his uncle at a compensation of $5 per week Chandler imposed upon his partners, a like situation arose when Frachiseur and Anderson recommended Garvin and Meadows to him.

Since we are unable to say that by a preponderance of the evidence Chandler is shown to have wrongfully inflicted loss upon his business associates, the decree and judgments must be affirmed.